REMER *v.* GOUL.

1. TRIAL—ELECTION OF COUNTS—CONTRACTS—PLEADING.
    Upon the trial of an action brought for the recovery of a
    shortage in a car of grain plaintiff should have been
    required to elect between two inconsistent theories set
    forth in the declaration, one of which was that he had
    bought the subject-matter of the transaction, the other
    that he had sold the grain as agent for the defendants
    and was compelled to make good the shortage;  the
    theories were so inconsistent that plaintiff should not be
    permitted to go to the jury upon the distinct issues raised
    by the counts.

2. PRINCIPAL AND AGENT — EXISTENCE OF RELATION — DISTINCTION
    FROM SALE.
    Where all the testimony as to the existence of an alleged
    agency was uncontradicted and tended to show that
    plaintiff, who owned and operated a grain elevator, agreed
    to take from defendants a car of rye which should be
    partly filled by the defendants and sent to plaintiff's
    elevator, where the car would be filled with his grain,

and that plaintiff should collect payment and deposit a portion to the credit of defendants and on the arrival of the car a shortage· was disclosed which the plaintiff made good to the purchaser, he should have been held as matter of law to have acted as agent for the defendants.

3. EVIDENCE—BOOKS AND RECORDS—HEARSAY—WEIGHT.
    Where evidence tending to show the weight of a car of grain given by an employee of the carrier over whose line it had been shipped was offered from a card upon which the weight had been originally written and was excluded upon the ground that the witness did not know the facts and that the testimony was hearsay, the court erred to the prejudice of the defendants: it should have been admitted and the question left for the jury to determine whether the weight was correct and where the leak, if any, had occurred so as to cause an alleged shortage.

Error to Kent; Brown, J. Submitted January 8, 1915. (Docket No. 27.) Decided April 6, 1915.

Assumpsit by Ernest A. Remer against John E. Goul and another for a shortage in weight of grain received by plaintiff from defendants. Judgment for plaintiff. Defendants bring error. Reversed.

*Louis T. Herman,* for appellants.

*Hall & Gillard,* for appellee.

Plaintiff owned and operated a grain elevator at Cedar Springs; defendants one at Sand Lake. Both were located on the Grand Rapids & Indiana Railroad; defendants' elevator being about five miles farther from Grand Rapids than plaintiff's. Both parties purchased rye from the farmers in their respective neighborhoods during the season of 1911. At the end of the season it was found that each had on hand part of a car load. They had some negotiations, and it was finally agreed between them that defendants should order a car placed at their elevator at Sand

Lake, should load into it such rye as they had on hand, then send it down the line to plaintiff's elevator at Cedar Springs, where plaintiff would place in the car his rye, and that plaintiff should sell the whole car on shipping directions to be given by one Wellman. It was further agreed that the plaintiff should secure pay for the entire car load, and should deposit the proportionate amount to the credit of defendants, retaining the balance for himself. Following this arrangement, the defendants ordered a car and loaded into it such rye as they had on hand. At the time of loading this rye it was not weighed. Defendants claimed to have kept account, however, of the rye as it was purchased from farmers and elevated to the bin from which it was drawn at the time of loading, as well as an account of certain small amounts withdrawn from said bin from time to time and sold for seed. Deducting the total of the latter quantities from the former left, according to their figures, 858 bushels. Making allowance for possible small errors, they billed it out to the plaintiff at 845 bushels, and wrote plaintiff the following letter:

"E. A. REMER,
    "Cedar Springs, Mich.
*"Dear Sir:*
    "I inclose b. of l. of car rye. My books show 858 bushels, but we have sold so much out of bin I billed at 845 bushels, and if it falls short I will make it up, and if it overruns some I will perhaps be the recipient.
                                    "Yours,
                                            "GOUL & SON."

When defendants' rye was placed in the car, two grain doors were made, but no partition was placed in the car. The rye was shoveled to one end of the car, but slanted down past the door toward the other end. Upon arrival of the car at Cedar Springs, the plaintiff, without putting a partition in the car so as to keep the defendants' rye separate from his own,

loaded into the car 722 bushels of rye. This car was then by the plaintiff shipped to a consignee in Buffalo under directions given him by Wellman, and the plaintiff drew upon Wellman for the purchase price of 1,567 bushels at 99 cents per bushel, which was the price agreed upon between plaintiff and Wellman. This price had been communicated to defendants and was satisfactory to them. The draft was paid by Wellman, and the proportion of the proceeds thereof due defendants for the 845 bushels claimed to have been placed in the car by them was deposited to their credit, and the balance thereof was retained by the plaintiff.

The car was shipped from Cedar Springs on November 11, 1911. It arrived in the city of Grand Rapids on or before November 13, 1911, and on that date was weighed. The gross weight of the car at that point, on that day, was 132,000 pounds, tare 44,200 pounds, leaving a net weight of 87,800 pounds. The railroad weight, therefore, made within two days after loading, showed the car to contain 48 pounds more rye than both parties claimed to have put in the car. The car was then sent east, and arrived at the M. C. yards, Victoria, Canada, November 19, 1911. It was inspected at the Victoria yards by Mr. Stratten, official inspector of the Buffalo Corn Exchange, on November 20, 1911. On December 8, 1911, it was unloaded at the Evans elevator at Buffalo. It was there examined by Mr. Riley, a deputy grain inspector of the Buffalo Corn Exchange. He weighed the contents of the car during the unloading, and found but 1,320 bushels and 20 pounds in all—a shrinkage of about 247 bushels. An official weight certificate was made by the official weighmaster of the Corn Exchange showing the above weights, and was sent to Mr. Wellman. Mr. Wellman sent it to Mr. Remer, the plaintiff, and Mr. Remer sent it to the defendants

on December 21, 1911, together with a claim for shortage and a request for them to look it up. On January 12, January 19, January 30, February 7, and February 16, 1912, plaintiff wrote defendants letters touching the shortage in question, and again on March 4, 1913. In the meantime, and on December 20, 1911, Wellman paid the shortage, and wrote a letter to the plaintiff demanding $244 to make up the shortage. After plaintiff received the demand from Wellman, and on June 22, 1912, he reimbursed Wellman for the alleged shortage without making any investigation in Buffalo, without the assent, and against the protest, of defendants. A claim was made against the railroad for shortage by plaintiff, which was finally rejected on January 11, 1913.

On July 17, 1913, plaintiff commenced this suit against defendants. The declaration contains two counts; the first of which sets out a sale by the defendants to the plaintiff of 845 bushels of rye and a shortage in the amount delivered of 246 bushels and 20 pounds, of the value of $244, for which demand is made. The second count sets out the agreement as it was, in fact, made; avers, in effect, that the plaintiff acted as agent for the defendants in making the sale in question; the failure of defendants to place in the car the agreed amount of rye; and makes demand for the sum of $244 alleged to have been paid by plaintiff on account of the default of defendants.

Early in the case defendants made a motion that the plaintiff be compelled to elect under which count in the declaration he claimed the right to recover; it being the claim of defendants that certain testimony was admissible under one count which would be inadmissible under the other. This motion was denied. All testimony as to the facts was admitted, and the court submitted the case to the jury practically upon the theory that, in disposing of the entire car load to

Wellman, the plaintiff acted as agent for defendants as to the portion of the car that belonged to them. The sole question submitted to the jury for their determination was whether or not there was a shortage in the car when it arrived at Buffalo, and, if so, whether that shortage was due to the fact that defendants had placed in the car 246 bushels of rye less than claimed by them. At the close of the plaintiff's case the defendants made a motion for a directed verdict upon the following grounds:

"The testimony shows a bailment for mutual benefit, and, such being the case, it was incumbent upon the plaintiff, the bailee, not to confuse his rye with the rye of the bailor, as was done in this case, and therefore the bailee, by his own negligence, must bear the entire loss, if any loss there is.

"The testimony shows that the plaintiff voluntarily paid the claim of $244 to Mr. Wellman without the consent and against the wish of defendants, and without defending any lawsuit, or even without any proof of a threat of a lawsuit, and therefore plaintiff cannot recover.

"For the reason that under the testimony in this case plaintiff by his own acts gave defendants no opportunity to defend themselves as having furnished 845 bushels of rye, and made it impossible for defendants to defend themselves at all because of the confusion of the goods by plaintiff, and therefore the plaintiff must bear the loss.

"Because under the testimony in the case and the theory of the plaintiff either plaintiff or the defendants must bear the entire loss, and that under the theory of the plaintiff and the testimony in the case, for the plaintiff to recover would shift the burden of proof contrary to law."

The motion was denied, and the defendants thereupon offered the testimony of one Fred R. Pickard, who gave evidence as follows:

"I am assistant yardmaster for the Grand Rapids & Indiana. As such yardmaster, I weigh the freight cars as they come in. I know that the Pennsylvania

cars change the weights on the outside every two or three years. I have the record of P. L. car 533075. It was weighed in Grand Rapids. This card (showing witness card) is the only record I have of the weights of the cars. It is the weight card of car P. L. 533075. The records were left in my files. I have charge of them. I have had charge of this particular card. I have charge of it ever since November 13, 1911, and that is the only record that is in our office. I think the man who weighed the car is not in our employ. I think he is in British Columbia, but I do not know where.

"*Mr. Herman:* I now ask that this card, Exhibit A for identification, referring to the card above, under the facts as they exist as shown by the evidence, be introduced in evidence as the best evidence.

"*Mr. Hall:* I object to it as incompetent, irrelevant and immaterial. We will be denied a chance of cross-examining the man who did the weighing of this car, and it would be incompetent for that reason. There are a great many things that might be taken into consideration as to the correctness or incorrectness of the weight.

"*The Court:* Well, it won't be received as absolutely final on the question, but it appears to be the only record made in the office of the transaction, and it may be received for what it is worth, and you can cross-examine the witness and show what he knows, or get as far as you can, but I will allow it to be received for what it is worth.

"Card then introduced in evidence showing gross weight of P. L. 533075 to be 132,000 pounds, tare 44,200 pounds, leaving net weight of 87,800 pounds."

Cross-examination:

"The Grand Rapids & Indiana have only one scale in Grand Rapids. A railroad scale is made just like any other ordinary scale with an arm or beam. The beam is in a house inclosed. The only outside part is the platform. The person who made this weight was a conductor. The conductor would have a switch card. The waybill never leaves the office. The conductor has no waybills. He merely has a switch card.

"*Q.* Suppose this car had been billed at 70,000 pounds. These figures are even figures just for the

purpose of illustration, and the actual weight of the car showed that it was 55,000 pounds. What weight would you put on your card?

"*A*. Put on the weight that the scale weighed. I have put on the scale weight a weight that was 15,000 pounds less than the waybill weight of the car. I presume I have done it 50 times or 100. I have worked for the Grand Rapids & Indiana 28 years. I have been assistant yardmaster about 9 years. The stenciled weight of the car is the tare weight. That is stenciled on the car itself.

"*Q*. Now, are there any circumstances which make the car itself weigh different than the stenciled weight of the car?

"*A*. Well, no; in the old wooden cars they would be after they had been out of the shop several years, but now they don't vary over 200 or 300 pounds, I should think, in the weight. I do not know what the condition of the weather was on November 12th and 13th, but, if there is snow in the car, there would be a notation on the weight card allowing 200 or 500 pounds for snow. There is nothing on this card. I do not know whether this car had ever been repaired. I do not know whether it had ever been in a wreck or any new trucks put under it. I don't know whether this car was cut off from the other cars when it was weighed. The supposition is that it was. I don't know whether this car was free at both ends from the other cars when it was weighed. The general custom is to cut—

"*Q*. Now, never mind, Mr. Pickard; you just answer my question 'Yes' or 'No.' Do you know whether it was detached at one end and detached at the other?

"*A*. It has to be detached at one end.

"*Q*. Do you know whether it was?

"*A*. Couldn't weigh it otherwise; they have got to cut one end.

"*Q*. Well, won't you answer my question?

"*Mr. Herman:* I submit he has. He says it is common—

"*The Court:* He has already said he don't know what the condition of the train was, and the last is another answer.

"*A*. I know of my own knowledge that it was cut

at one end. I was not there. I know the car was standing still when it was weighed. I was not there, but can't weigh a car unless it is standing still."

In charging the jury upon this point the learned trial judge said:

"I charge you that the testimony of Mr. Pickard as to the alleged weight of the car at Grand Rapids is not, under the circumstances of the case, any evidence as to the amount of rye that was in the car. He did not weigh the car himself, and was not there; he did not make the record, and did not know the conditions or any of the surroundings under which it was weighed, and his statement and the statement on the card that was offered and received in evidence that there was 87,800 pounds in that car is not any evidence of that fact. I might say, under the circumstances, that in view of the fact that the testimony was solely limited to the car, and not verified by any witness able to verify it, that the testimony in regard to the card should be stricken out, and I substantially charge you to that effect that the card offered in evidence as showing the weight in the Grand Rapids & Indiana yard, no witness being here to show under what circumstances the weights were made, whether the car was detached from the train or what conditions were surrounding the car, the weights as given being even thousand pound weights, so far as tending to establish with any degree of accuracy the weight of the car, the card does not do it, and there is no evidence to corroborate the weight as given by this card, and therefore it would be no evidence of the fact as to how much rye there was in the car, as to the number of thousand pounds of rye, and the railroad car altogether weighed, as I say the figures are given in even thousand pounds, as I remember them, or even hundred anyway, and that might have some tendency, if that point were material. But this point is how much rye was in and what the tare weight was, what the condition of the car was, what conditions were under which it was weighed, whether it stood next to a low car or was coupled down to it, which would tend to pull it down, whether it stood next to a high car and connected to a drawbar which would

hold it up, if it were connected, those facts are not known, but would give some light as to the weight. Undoubtedly there was something in the car, but in regard to bushels and pounds it would not help us in this case."

The jury rendered a verdict in favor of plaintiff and against defendants in the sum of $244, and interest—a total of $263.30.

BROOKE, C. J. (*after stating the facts*). We are of opinion that the learned trial judge was in error in declining to compel plaintiff to elect upon which count of his declaration he would go to the jury. The theories of the two counts were not consistent with each other, and it is obvious that, if the plaintiff acted in the transaction entirely as agent for the defendants in the disposal of their rye, his duties to them and their obligations to him would be measured by the rules of law covering the relationship of principal and agent. It is true that the real question for the determination of the jury was whether or not the defendants actually placed in the car 845 bushels of rye, as they claimed, but, assuming that they, either through mistake or fraud, did not ship the claimed amount to plaintiff, their rights as principals and the plaintiff's duty as agent are fixed under legal principles entirely different from those which would have been applicable had the defendants been simply vendors and the plaintiff vendee of a stipulated number of bushels of rye. We think that the record fairly discloses the fact that the plaintiff did undertake and, in fact, did sell for the account of the defendants 845 bushels of rye, as their agent. This being the relation between the parties, it may be questioned whether, as such agent, the plaintiff had a legal right to adjust the claimed shortage with Wellman without the consent and against the protest of the defendants, and then look to them for payment. The court should have in-

structed the jury as to the rights and obligations of the parties upon the theory that plaintiff acted throughout the entire transaction as agent for the defendants.

In excluding the record evidence of the weight of the contents of the car at Grand Rapids, we think the learned trial judge was plainly in error. See *Meyer* v. *Brown*, 130 Mich. 449 (90 N. W. 285), where a car weight record was held to have been properly admitted in evidence, although the testimony was received from the yardmaster, who testified from a book in which was copied the weights from the original card, which had theretofore been destroyed, and the entries in the book not having been made by the witness. The case is practically identical with the one at bar, except that Pickard testified from the original card, instead of a copy thereof. If this testimony had been admitted, and if the jury had been satisfied that the car was correctly weighed in Grand Rapids, it is clear that the 246 bushels either leaked out on the way to Buffalo, was stolen in the yards at Buffalo, or that the weights at destination were inaccurate.

We are of opinion that the defendants clearly had the right to this testimony, and to argue, as a legitimate inference from its truthfulness, that they, at any rate, were not responsible for the shortage in the car.

We have not overlooked the fact that plaintiff offered evidence tending to show that upon inspection in Buffalo the car showed no evidence of leakage, and that the inspector at that point found the seals unbroken. It is, however, we believe, true that the ingenuity of the dishonest has heretofore devised means of abstracting the contents of cars without disturbing the seals.

The evidence adverted to was not conclusive upon defendants, but should receive consideration from the jury, together with all the other testimony upon the

disputed question: "How much rye did defendants actually place in the car at Sand Lake?"

For the errors pointed out, the judgment is reversed, and a new trial granted.

McALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.